| | |
|---|---|
| **ANTHONY LYN STEVENSON,** | **CIVIL ACTION NO.: 15-5933** |
| *Plaintiff* | |
| vs. | |
| **GREAT VALLEY SCHOOL DISTRICT** | January 8, 2016 |
| *Defendant* | |

### PLAINTIFF'S REPLY TO DEFENDANT'S MOTION FOR SANCTIONS

Unquestionably, the ability to deny one's opponent the services of capable counsel, is a potent weapon. Confronted with such a motion, courts must be sensitive to the competing public policy interest[] . . . of permitting a party to retain counsel of his choice. *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988) .

If the truth be told, disqualification can itself be a weapon in the adversarial contest intended to accomplish strategic litigation goals of the requesting party, like retiring from the scene the very lawyers in whom an opponent has the most confidence . . . or simply launching a thinly veiled ad hominem attack, all under the cover of a dutiful effort to reprove an ethically challenged lawyer. Only the naive would discount the possibility of such motivations infecting modern litigation. For these reasons, courts should "always remain mindful" of the "possibility of misuse of disqualification motions for strategic reasons."    *Gay v. Luihn Food Sys., Inc.*, 54 Va. Cir. 468, 470-71 (Cir. Ct. 2001).

### I. The Proliferation of Offensive Motions to Disqualify

Early in the twentieth century, motions to disqualify attorneys were rare. But changes in the legal profession have "resulted in a proliferation of motions to disqualify." As motions to disqualify proliferate, courts are increasingly concerned about the use such motions as a dilatory or offensive tactic. [1] "The proliferation of [disqualification] motions may be explained, in part, by the decreasing reluctance on the part of some counsel to resort to disqualification in an effort to secure a strategic advantage for their client."[2] See, e.g., *Vegetable Kingdom, Inc. v. Katzen*, 653 F. Supp. 917, 919, 925-26 (N.D.N.Y. 1987)("The court is well aware that disqualification motions are often interposed for tactical reasons wholly unrelated to concerns for the maintenance of the ethical standards of the legal profession. Such motions are often designed to harass opposing counsel, . . . The court finds this cynical perversion of the commendable objectives which inspired the promulgation of codes of conduct designed to guide an attorney through difficult ethical dilemmas particularly offensive."); *Alexander v. Super. Ct.*, 685 P.2d 1309, 1317 (Ariz. 1984) (denying motion to disqualify in part because movant appeared to be using the motion as a "tactical tool" for the "purpose of harassing"); N. *Am. Foreign Trading Corp. v. Zale Corp.*, 83 F.R.D. 293, 296-97 (S.D.N.Y. 1979)("No purpose

---

[1] Hon. Rebecca Simmons, Manuel Maltos, *Exploring Disqualification of Counsel in Texas: A Balancing of Competing Interests*, The Fifth Annual Symposium on Legal Malpractice and Professional Responsibility, 37 ST. MARY'S L. J. 1009, 1011-1013 (2006)
[2] Richard Flamm, LAWYER DISQUALIFICIATION: CONFLICTS OF INTEREST AND OTHER BASES, 16 (2003) cited in Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71, 91 (2014).

has been served by the instant motion other than to harass plaintiff and his counsel and to delay these proceedings further . . . . The motion was a ploy and it was designed as a vexatious and oppressive tactic against plaintiff and its counsel."); *Spear v. Fenkell*, No. 13-02391, 2014 U.S. Dist. LEXIS 164881, at *20 (E.D. Pa. Nov. 24, 2014)("The motion to disqualify has all the features of the untoward 'procedural weapon' . . . ").

## II. Applicable Law

Motions to disqualify are an extreme sanction,[3] only impose when "absolutely necessary."[4] The Rules of Professional Conduct are not designed "as an addition to the depressingly formidable array of dilatory strategies already part of the litigator's arsenal." *Caracciolo v. Ballard*, 687 F. Supp. 159, 160-61 (E.D. Pa. 1988). The reason for such disfavor and suspicion of motions to disqualify is the fear that one could use the rules as a "procedural weapon." See *Wolf, Block, Schorr & Solis-Cohen v. Navon*, No. Civ.A. 05-6038, 2006 U.S. Dist. LEXIS 9859, 2006 WL 680915, at *1 (E.D. Pa. Mar. 9, 2006) (citing *Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994); In *Spear*, Judge Lloret underscored the importance of the timing of such motions:

> Timing is important when considering a motion to disqualify. Courts "should consider the length of the delay in bringing the motion to disqualify, when the movant learned of the [ethics violation], whether the movant was represented by counsel during the delay, why the delay occurred, and whether disqualification would result in prejudice to the nonmoving party." . . . In this jurisdiction, courts have denied such motions brought long after the substance of the litigation arose. [Internal citations omitted]

Judge Lloret's sage insight regarding the role of timing in disqualification determinations fits with the axiom in labor and employment law that suspect timing is strong indirect evidence of pretext and bad motive.

## III. The Timing of Kristofco's Motion to Disqualify and Expanded Gag Order is Suspect

*a. Kristofco Waited 2 Years, 6 months, and 19 days to Move to Disqualify*

On December 8, 2016, Kristofco moved to disqualify Stephens. ECF No. 73. But Kristofco has known since May 20, 2014, that Stephens represents Stevenson. See Exhibit 1. Stephens' inquiry to Koslo Stahl took place the next day, May 21, 2014. Yet Kristofco waited more than 2 years and 6 months to move to disqualify.

Further, even assuming that Stephens' innocuous May 21, 2014 inquiry violated the non-contact rule, a "finding that counsel is in violation of the Rules of Professional Conduct does not result in automatic

---

[3] *Shade v. Great Lakes Dredge & Dock Co.*, 72 F. Supp.2d 518, 520 (E.D. Pa. 1999). cited in *Spear v. Fenkell*.
[4] *Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav.*, FSB, 944 F. Supp. 341, 345 (D. N.J. 1996) cited in *Spear v. Fenkell*.

disqualification" because of the various policies that must be weighed. *Henry v. Del. River Joint Toll Bridge Comm'n*, No. CIV. A. 00-6415, 2001 WL 1003224, at *17, 2001 U.S. Dist. LEXIS 13462, at *17 (E.D. Pa. 2001). If the Rules have been violated, the court's final step must be to address whether disqualification of counsel furthers the purposes of the Rules. *Jordan v. Phila. Hous. Auth.,* 337 F. Supp. 2d 666, 672 (E.D. Pa. 2004)  But even arguendo that Stephens' inquiry violated the no-contact rule and warranted disqualification, the District must explain why it waited 2 years, 6 months, 19 days to move to disqualify. See ECF No. 73.

If Stephens' May 21, 2016 inquiry about Policy 448 representation procedure was such an egregious violation of the no-contact rule, an ethical violation of such magnitude that disqualification of Stephens was the only possible remedy, then why did the District wait 2 years, 6 months, 19 days to move to disqualify Stephens? Why did the District not move, for example, to disqualify Stephens as representative for Plaintiff a few months when the PHRC and EEOC complaints commences? Or why, for example, did the District not move to disqualify Stephens as counsel when Plaintiff applied for pro hac vice admission on March 21, 2016?

The timing of Kristofco's motion to disqualify is also suspicious vis-à-vis the internal union communications with Meishwich on August 21, 2016 (110 days prior) and September 7, 2016 (93 days prior); the mediation privilege protected facilitated dialogue request on September 1, 2016 (99 days prior); and the Constitutionally protected Facebook posts regarding harassment and discrimination by this government entity and the government officials running it on September 7, 2016 (93 days prior) and September 8, 2016 (92 days prior). Basically, if these communications warrant disqualification, why wait three months more or less.

### b. Kristofco's Trial by Ambush – His Suspiciously Timed Motion to Disqualify

Rather than moving to disqualify in Fall 2014 or March 2016, Kristofco opted instead for trial by ambush.[5] See *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1259 n.4 (3d Cir. 1991) ("The Federal Rules of Civil Procedure, Local Rules . . . and this court's own pretrial protocol are designed to prevent trial by ambush."). By ambushing on December 8th, on a date when he knew Stephens would be indisposed with preparation for the next day's hearing, Kristofco achieved the functional equivalent of an ex parte communication – he got the Judge's ear days before Stephens could respond.  The suspect timing of Kristofco ambush indicates that the

---

[5]   The timing of the Kristofco's motion for a protective order filed just 5 days after Stephens filed ethics charge is also suspect. T

purported ethics violation was simply a pretext. The ambush aimed to maximize the efficacy of the "weapon."[6]

**IV. Kristofco's Ambush Disqualification Motion Is Dilatory**

The suspiciously-timed motion to disqualify sought not only to deprive the Plaintiff of his attorney of choice, but to delay any ruling on Plaintiff's dispositive motions. On October 10, 2016, Plaintiff filed a motion for default judgment. On November 25, 2016, Plaintiff filed a motion for partial summary judgement on the Plaintiff's retaliation complaint count. Coming just two weeks after the Plaintiff's partial motion for summary judgment, Kristofco's motion to disqualify would have frozen any ruling on these dispositive motions.

**V.  The Bases of Kristofco's Ambush Disqualification Motion Are Unethical or Unlawful**

Kristofco's ambush motion is not only suspiciously timed, its bases are unethical or unlawful. His claim that the inquiry to 448 intake officer Koslo Stahl violated the no-contact rule (and ethics complaints on that basis) rest on a sweeping conception of the rule that this Circuit and its district courts have rejected. See *Univ. Patents, Inc. v. Kligman*, 737 F. Supp. 325, 328 (E.D. Pa. 1990)(The court is unpersuaded by plaintiff's assertion that Rule 4.2 shrouds every custodian, cafeteria worker and receptionist simply in light of their mantle as "corporate employee."); *McDevitt v. Verizon Servs. Corp.*, No. 14-4125, 2016 U.S. Dist. LEXIS 34777, at *13-14 (E.D. Pa. Feb. 22, 2016)(Defendant's interpretation of R. 4.2 goes too far. . .  Rule 4.2 is intended to forbid ex parte communications with all institutional employees whose "acts or omissions could obligate or impute liability to Defendants with respect to the matter."). By knowingly making a false claim to this Court and disciplinary authorities, Kristofco violates his duty of candor and misuses the ethics process.

Kristofco's attempt to use internal union communications related to the CRTC and PR&R processes, as a basis for disqualification or ethics action constitute unfair labor practice under the PLRA, creating the impression of surveillance and coercing union activity. Kristofco's use Constitutional free speech as the basis for disqualification and ethics action violate Section 1983 and the First and Fourteenth Amendments.

**VI.  Kristofco's Ambush Motion is a Yet Another Example of Defendant's Habitual Lack of Candor**

Kristofco's ambush motion is another example of his habitual lack of candor with tribunals handling this case. It is well established law in this Circuit that such candor is obligatory rather than discretionary.

---

[6] The next day Kristofco ambushed again, unilaterally abrogating the parties' Rule 26 agreement to mediate after discovery. The Plaintiff is researching whether a breach of contract or promissory estoppel claims can be brought due to that breach.

>An attorney has an obligation of candor to the court. Model Rules of Professional Conduct Rule 3.3(3) (1983). Although this rule specifically refers to an attorney's obligation to disclose controlling precedent to the court, it necessarily applies as well to the disclosure of material facts and "any development which may conceivably affect an outcome of the litigation." *In Re Universal Minerals, 755 F.2d 309, 313* (3rd Cir. 1985), cited in *Fischer & Porter Co. v. Tolson*, 1993 U.S. Dist. LEXIS 14719, at *6 (E.D. Pa. Oct. 19, 1993)

*In Re Universal Minerals* and *Fischer* hold candor is required by Rule 3.3(a)(1)(2)("A lawyer shall not knowingly . . . (1)  make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;" and  fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel). Kristofco and Diaz have repeatedly violated these rules.

In his answer in PHRC Case No. 201305927, Kristofco defended Souder's use of the racial slur "ghetto names" to describe the names of Stevenson's brother and sister based on the absence of a discharge, lack of intent and more a dozen affirmative defenses.  All three of Kristofoco's arguments misrepresent the law.

First, no showing of intent is required in harassment cases. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973) (holding a prima facie case can be met with no showing of intent). Second, no "tangible employment action" like a discharge is required to bring a Title VII harassment case against an employer if the conduct is "severe and pervasive." *Burlington Indus., Inc. v. Ellerth*, 118 S. Ct. 2259, 2270 (1998). Third, in harassment cases lacking a tangible employment action, the employer has **one** (1) affirmative defense – not a dozen and a half. See *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293 (1998) ("When no tangible employment action is taken, a defending employer may raise an affirmative defense . . . [with] two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.") By advancing three arguments lacking any basis in law at PHRC, Kristofco violated Rule 3.3(a)(1) and (2).

At EEOC, Kristofco falsely claimed that Stevenson's PHRC No. 201305927 (the "ghetto names" complaint) and his EEOC No. 530-2014-02490 (the multi-allegation complaint) were duplicative, despite the fact that the two complaints deal with entirely different transactions. Kristofco could have established the lack of overlap simply by reading the EEOC complaint's Section D(4) and footnote 18 which state:

5

> [D]4. on March 27, 2014, Principal Souders discriminated against Mr. Stevenson by referring to the names of Mr. Stevenson's brother and sister as "ghetto names"[18]
>
> [18] This comment is the subject of a separate discrimination claim with the Pennsylvania Human Rights Commission. It is included here as a background fact. See Exhibit 2, p. 3.

But as if so often the case, Kristofco's myopia is selective, he missed D(4) and footnote 18.

Kristofoco's duplication argument is also belied by the fact that separate right-to-sue letters issued for these two complaints. The right-to-sue letter for PHRC No. 201305927 was issued by the EEOC on September 28, 2015. The right-to-sue letter for EEOC No. 530-2014-02490 was issued by the Justice Department on November 2, 2015. If the latter filed EEOC complaint was duplicative of the PHRC as Kristofco claimed, then only one right to sue letter would have issued. By claiming duplication where there was none, Kristofco violated 3.3(a)(1)("A lawyer shall not knowingly . . . make a false statement of material fact to a tribunal).

Kristofco's lack of candor continued before this court. After claiming to the EEOCm that PHRC No. 201305927 and EEOC No. 530-2014-02490 were the same complaint, the Defendant changed its story and argued the exact opposite in ECF No. 3 and in the first conference with Judge Schmehl on May 17, 2016. In both, the Defendant argued that complaint allegations associated with EEOC No. 530-2014-02490 should be dismissed because the right-to-sue letter accompanying the complaint was the right-to-sue letter for PHRC No. 201305927, not the right-to-sue letter for EEOC No. 530-2014-02490. In ECF No. 3, the Defendant argues:

> The Discrimination Complaint which was attached . . . was filed as part of EEOC Charge 530-2014-02490 - which is a different charge number than the one for which Stevenson received a right to sue letter. ECF. No. pp. 3 – 4.

Kristofco can't have it both ways. If, as he claimed at EEOC, the PHRC and EEOC complaints are the same complaint, then one right-to-sue letter suffices. But if, as he argued to this Court, the PHRC and EEOC complaints were separate, then two right-to-file letters. In either contingency, Kristofco's claims violates his ethical obligation of candor with a tribunal handling this case. If the Plaintiff's complaints are duplicative, then his claim to this Court that two right-to-sue letters are required lacks candor. Or if the Plaintiff was advancing two claims, then his earlier claims to the EEOC that the Plaintiff filed duplicative claims lack candor.

The lack of candor by Defendant's counsels continued in conferences with the Judges. In the initial conference with Judge Schmehl, it is undersigned's recollection that Ms. Diaz claimed that Court lacked subject matter jurisdiction over Mr. Stevenson's complaint because two right-to-sue letters hadn't been filed

6

with the complaint or because the wrong right to sue letter was filed with the complaint. In *Pyne v. Procacci Bros. Sales Corp.*, Civil Action No. 96-7314, 1998 U.S. Dist. LEXIS 9501, at *3-4 (E.D. Pa. June 26, 1998):

> The timely filing of a charge with the EEOC and receipt of a right to sue letter, however, are not jurisdictional requirements. See *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, (1982). Thus, even if the EEOC right to sue letter were somehow "void," this would not deprive the court of subject matter jurisdiction over plaintiff's Title VII claims. Id.

Because subject matter jurisdiction does not depend on a right to sue letter, any such misstatement of government law by Diaz would have violated 3.3(a)(1) shall not knowingly . . . make a false statement of . . . law to a tribunal . . . ") and 3.3(a)(2) ("shall not knowingly . . . fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client . . .").

Ms. Diaz also misstated legal authority in her response to Plaintiff's objection to the Defendant's discovery Request 35 for HIPAA and doctor-patient privileged medical information. About a week after the District's request, Plaintiff timely provided responsive documents and objections to problematic requests. Given that Rule 16 expressly provides, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . " Plaintiff was not required to turn over privileged documents. Stephens' refusal to hand over the privileged documents was not obstructionist, vexatious or trivial. As a former ERISA-attorney, Stephens knows that those possessing confidential or privileged medical and psychological documents through employer sponsored benefits cannot simply hand those documents over upon request. A HIPAA compliant protective order be disclosed. Those statutory requirements not only protect the medical confidentiality of the "patient" but all subsequent handlers of the document, including both parties to this litigation, its counsels and witnesses if any.

But despite their seeming lack of any ERISA compliance experience or ERISA training, Mr. Diaz and Mr. Kristofco knew better than Stephens. On August 25, 2016, the day after the Plaintiff objected to disclosure of HIPAA protected documents in the absence of a statutorily compliant protective order, Diaz wrote:

> In your Second Amended Complaint you seek . . . compensatory damages for "physical illness and emotional distress resulting from physical illness (severe emotional distress, anxiety, frustration, embarrassment, humiliation, lost self-esteem, hopelessness, marital strife, social withdrawal, indigestion, weight loss, and lethargy)," which you claim are "directly resulting from District harassment and retaliation." Thus, you have raised the issue of Mr. Stevenson's physical illness and emotional distress in your complaint, and the District is entitled to discovery on these issues. . . . will be necessary for the District to secure the documents and information requested concerning your client's physical and mental health.

Diaz provided no authority of any kind for her claim that the Plaintiff's compensatory damages remedy required the provision of documents and information to the District. No such authority was provided because none exists. It is well-settled that compensatory damages can be awarded without any documentary support.

The Defendant's Request 35, Diaz e-mail to Stephens and the Defendant's compensatory--damages related communications with the Judge show an an utter lack of knowledge of Title VII compensatory damages. In *Androvich v. Secretary of Agriculture*, 01950531 (1996), the Commission gave a good general summary of the definition of compensatory damages and the evidentiary elements of those damages:

> Compensatory damages may be awarded for past pecuniary losses, future pecuniary losses, and nonpecuniary losses that are directly or proximately caused by the agency's discriminatory conduct. Compensatory and Punitive Damages Available Under Section 102 of the Civil Rights Act of 1991, EEOC Notice No. N 915.002 (July 14, 1992), at 11–12, 14. Pecuniary losses are out–of–pocket expenses incurred as a result of the employer's unlawful action, including job–hunting expenses, moving expenses, medical expenses, psychiatric expenses, physical therapy expenses, and other quantifiable out–of–pocket expenses. Id. Past pecuniary losses are pecuniary losses that are incurred prior to the resolution of a complaint via a finding of discrimination, the issuance of a full–relief offer, or a voluntary settlement. Id. at 8–9. Future pecuniary losses are losses that are likely to occur after resolution of a complaint. Id. at 9. Nonpecuniary losses are losses that are not subject to precise quantification including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation, injury to credit standing, and loss of health. Id. "[C]ompensatory damage awards must be limited to the sums necessary to compensate [a complainant] for actual harm, even if the harm is intangible." Id. at 13. Thus, a compensatory damages award should reimburse a complainant for proven pecuniary losses, future pecuniary losses, and non-pecuniary losses.

Consistent with the EEOC's findings and guidance, Stephens informed Defendant and its counsels that their assumption that Stevenson had to verify his intangible compensatory damages with "documents and information requested concerning your client's physical and mental health" was simply wrong. No such documentary proof of Stevenson's intangible non-pecuniary compensatory damages was required. Indeed, as in nearly all other cases, no documentary proof of intangible emotional distress type damages exists.

As Stephens pointed out in the conference with the Judge, the jury instructions that Third Circuit courts uses for compensatory damages in Title VII cases fits with both EEOC guidance and Stephens' position:

> You may award damages for any pain, suffering, inconvenience, mental anguish, or loss of enjoyment of life that [plaintiff] experienced as a consequence of [defendant's] [allegedly unlawful act or omission]. **No evidence of the monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence.** There is no exact standard for fixing the compensation to be awarded for these elements of damage. Any award you make should be fair in light of the evidence presented at the trial.

8

Contrary to Ms. Diaz and the Defendant, the Plaintiff need not provide receipts or medical information to prove "intangible" compensatory damages. Those compensatory damages can be established, as the Circuit's jury instruction make clear, by the testimony of the Plaintiff, his family members, or medical or psychological personnel (and attacked by cross examination of those witnesses by the Defendant.) But if Diaz had had her way, Plaintiff's counsel would have obtained and turned over HIPAA and ERISA-protected medical documents to the District without a protective order, based on nothing more than Diaz' bare assertion of "necessity."  Contrary to Diaz, Stephens, the EEOC, theThird Circuit's jury instructions, and HIPAA all support Stephens good faith objection to Request 35 and contradict false claims of "flat out" refusal to comply.

Rather than simply agreeing to a HIPAA-compliant protective order, Defendant attempted to make hay out of Stephens' rightful refusal to turn over HIPAA-protected and confidential medical or psychological documents without a protective order.[7] In a September 12, 2016, ex parte letter to the Judge, Kristofco claimed:

> Plaintiff has provided the District with untimely, deficient and incomplete discovery in this matter. Accordingly, given that the fact-discovery deadline of November 8, 2016 is quickly approaching, the District requests court intervention to facilitate discovery in this matter.[8]

Notably missing (and conveniently omitted) from this ex parte communication was any mention that three weeks earlier, Stephens had explained to Diaz and Kristofco why the HIPAA protected documents were not needed. By omitting this material fact from his ex parte request for "court intervention" Kristofoco violated rule 3.3. As Rule 3.3's Comment #3 related to the Representations by a Lawyer provides, "There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."

In the conference that ensued, Kristofco's lack of candor continued. Rather than being truthful and informing the Court that the parties disagreed over the "necessity" of disclosure of the documents to prove compensatory damages and the "necessity" of a HIPAA-compliant protective order, Kristofco opted to lie. Just Kristofco lied in his letter when he claimed that the discovery deadline was fast approaching, Kristofco repeatedly claimed that Stephens' "*flat out*" refused to provide the documents in question. This was untrue.

But Stephens did not "flat out" refuse. According Merriam Webster's dictionary, "flat out" means

---

[7] The HIPAA-protective order issue is exemplary regarding the view of the District and its counsels that compliance with the law is discretionary rather than obligatory. Whether Title VII, HIPAA or ERISA, the District and its counsels take the position that compliance with the law is a trifle that can be ignored whenever compliance is inconvenient.

[8] Nothing better shows Kristofco's lack of credibility than his claim that a discovery deadline three months away was fast approaching. Needless to say this misrepresentation of fact to the Court is also a violation of Rule 3.3.

"absolute and complete" – e.g., "flat-out lie" or "a flat-out refusal."[9] Stephens' refusal to turn over documents responsive to Discovery Request 35 wasn't flat out, absolute or complete. Quite the contrary, he simply requested that the parties execute the statutorily-required protective order. Cf. *Harris v. Lanigan*, Civil Action No. 11-1321 (MAS) (DEA), 2016 U.S. Dist. LEXIS 85762, at *4-5 (D.N.J. July 1, 2016)(holding "Plaintiff simply *flat out* refused to comply" with discovery requests based on several "nonsensical arguments" including the lack of any objections by the Plaintiff to the Defendant's discovery requests.) Unlike the plaintiff in *Harris v. Lanigan*, Stephens did not "flat out refuse" to comply with Defendant's Discovery Request 35 - Stephens filed and expounded objections based on EEOC case law and guidance and HIPAA to Request 35. And once the parties, agreed to the statutory protective order, the Plaintiff provided the requested medical documents.

This is yet another example of Defendant's unethical lack of candor with this forum. Despite knowing that Stephens' objection to Request 35 was made in good faith, based on his ERISA-experience, his knowledge of HIPAA, his familiarity with the EEOC's guidance on non-pecuniary compensatory damages, and the Third Circuit's jury instructions for Title VII compensatory damages, Kristofco chose instead to mislead the court by claiming that Stephens' "flat out" refused to provide the documents to create the misimpression of bad faith.

Kristofco's attempt to paint Stephens as a "flat out" violator of discovery rules when Stephens was actually counseling compliance with HIPAA is anything but run-of-the mill litigation related puffery. Kristofco's attempts to mislead the Court into believing that Stephens was flat out refusing to cooperate in discovery coincides with the District's ramped0up efforts to chase Stevenson from his position.

On September 12, 2016, Mr. Kristofco communicated ex parte with the Court regarding Stephens' purported lack of discovery compliance. On September 16, 2016, Stevenson was placed on a PIP based in large measure on the unethical disclosures of District informant Meiswich. Kristofco's repeated dishonest claims that Stephens was "flat out" refusing to provide documents were made in a conference with Judge Schmehl that occurred the very same day that the District PIP-ed Stevenson. Thus, the District's violations of the CBA, the PHRA, and Title VII coincided with Kristofco's knowing misrepresentations in violation of Rule 3.3.

Kristofoco's lack of candor with the Court on September 16 regarding Stephens' "flat out" refusal to

---

[9] http://learnersdictionary.com/definition/flat%E2%80%93out

provide documents responsive to Request 35 wasn't standard discovery-related tactics. Given that his attack on Stephens came the same day Stevenson received yet another in the long string of discriminatory, harassing, and retaliatory PIPs, Kristofco's misrepresentations in the September 12, 2016 letter and the September 16, 2016 conference are part of a cynical and unlawful two-pronged attack on Stephens and his counsel Stephens.

The District and Kristofoco's two-pronged attack on Stevenson and his counsel began on September 12 ramped up subsequently. Less than two weeks later, on September 28, 2016, Kristofco filed an unethical, unlawful and unconstitutional motion for a protective order to create the impression of surveillance, coerce communication between Stephens and other union members, prevent communication between Stephens and Stevenson's union-member friends and GVEA representatives, and to prior restrain Stephens' Constitutional free speech in violation of Section 1983 and the First and Fourteenth Amendment of the Constitution.

On October 12, 2016, contradicting his earlier claims that Stephens' flat out refused to provide documents, Kristofco filed a motion to motion to compel. See ECF No. 47. Tellingly, in a tacit admission his claims of "flat out refusals" by Stephens were untrue, Kristofco listed the Stephens' objections under Federal Rules 26 and 34. to several of Defendant's discovery requests. The fact that opposing counsel does not agree with another counsel's good faith Rule 26 and Rule 34 objections does not render those objections "flat out" or "absolute" or "complete."  To argue otherwise, as Kristofco did, ignores the obvious – parties often spar over the scope and extent of discovery. Such sparring does not render objections "flat out."

Nor was Stephens "flat out" refusing to cooperate. Upon receipt of Stephens' objections, Kristofco and the Defendant had two options – reply by arguing that the objection was invalid and ask Stephens to voluntarily disclose or file a motion to compel. Neither of those alternatives would have been met with a "flat out" "complete" and "absolute" refusal to provide the documents. The facts prove this nonsensical accusation false – Stephens provided documents willingly in the process of discovery. Indeed, aside from the HIPAA protected documents and the irrelevant tax documents requested, the Plaintiff and Stephens were happy to turn over documents because, unlike the District, they have nothing to hide. But rather than acknowledging that the Plaintiff was cooperating with discovery, Kristofco invented a fiction of non-cooperation so that he could file a needless motion to compe.  Thus, Kristofco's motion to compel had the same aim as his knowingly false "flat out" refusal allegations on September 16 – to paint opposing counsel in an unfair and unfavorable light.

Both the Defendant's motion for a protective order (ECF No. 41) and its motion for sanctions (ECF No. 73) are parts of the Defendant's two-pronged attack on the Plaintiff and his Counsel. A fortnight after it gave Stevenson a PIP, the District moved, on September 28, 2016, for a gag order that would coerce Stephens statutorily protected union communication and chill and prior retrain his Constitutionally protected free speech. But that gag order wasn't enough for the District. Since then, in a recent series of pleading (ECF Nos. 73, 84, 87 and 88), the District has moved to extend that gag order to litigation related communications by Stephens.

In those pleadings (ECF Nos. 73, 84, 87 and 88), the District moves the Court to strike all pleadings filed by Stephens after his withdrawal. The District seeks this draconia remedy to create a record that includes a barrage of untrue allegations against Stephens, but not his reply. Thus, according to the District, the Court should not only disqualify Stephens but sanction Stephens for attorney's fees based on a record that only includes the District's arguments but not the Plaintiff's responses and defenses. Needless to say, the Court cannot deprive Stephens of property (i.e., payment of a fees sanction) without procedural due process. And procedural due process and fundamental fairness required that both sides be heard. Not just the District.

The District's expanded gag order request, which would purge Soviet-style, any recent pleadings by Stephens. As the Judge has acknowledged, Stephens cannot drop Stevenson like a hot potato, he is required both by his ethical obligations and his obligations to the Court, to continue to have representation duties to Stevenson. Ignoring Stephens ethical obligations to this client and his obligations to the court, the District moves that the Court strike all pleadings from the moment of Stephens' withdrawal.

In addition to his continued post-withdrawal obligations to the court and his client, Stephens has the obligation and the Constitutional procedural right to defend himself against the accusations of the District as found in its motion for a protective order (ECF No. 41, its motion to disqualify (ECF No. 73), and related recent pleadings (ECF No. 84, 87, and 88). Given that Stephens may face contempt- and other sanctions based as a result of allegations made by the District in ECF Nos. 41, 73, 84, 87, and 88, procedural due process and fundamental fairness require that Stephens be permitted, withdrawal or not, to provide responsive pleadings. And countering the accusations and allegations made by the District is precisely what Stephens' most recent pleadings - ECF No. 85, ECF No. 86 and soon-to-be-filed ECF No. 89 and 90 - do.

That Stephens be provided Constitutional procedural due process and the opportunity to respond to

the District's accusations is particularly important given the fact that the District has actually accused Stephens of criminal law violations, including witness intimidation and stalking. But under the District expanded gag order, it would be at liberty to make criminal law allegations without Stephens' being able respond.

For example, in his motion to disqualify, Kristofco characterized Stephens' Constitutionally protected Facebook posts as criminal "cyberstalking."  The notion that Stephens should not be permitted to file pleadings responsive to an allegation of criminal activity simply ignores Constitutional Due Process. Instead, Stephens submits that if the District is going to make accusations like this, that he can rightly respond.

Under 18 Pa.C.S § 2709.1, a person commits the crime of stalking when, with intent to harass, annoy, or alarm another, the person engages in a course of conduct or repeatedly commits acts which serve "***no legitimate purpose***." [Emphasis added]. See *Hartzell v. Cummings*, 2015 Phila. Ct. Com. Pl. LEXIS 313, at *7 (Pa. C.P. Nov. 4, 2015). Pennylvania's stalking statute provides in relevant part:

> § 2709.1.  Stalking.
> (a) Offense defined.--A person commits the crime of stalking when the person either:
> (1)  engages in a course of conduct or repeatedly commits acts toward another person . . . . under circumstances which demonstrate either an intent to . . . cause substantial emotional distress to such other person; or
> . . . .
> (e) Application . . . . **This section shall not apply to constitutionally protected activity.**
> (f) Definitions.--As used in this section, the following words and phrases shall have the meanings given to them in this subsection:
> "Communicates."   To convey a message **without intent of legitimate communication** or address . . . electronic means, including telephone, electronic mail, Internet, facsimile, telex, wireless communication or similar transmission.
> . . .
> "Emotional distress."  A temporary or permanent state of mental anguish.

Although the stalking statute expressly excludes Constitutional protected activities and those with a legitimate purpose, and an intent to cause substantial emotional distress, Kristofco accused Stephens stalked the District. This nasty rhetorical flourish is ironic given the District's position on Stevenson's case. Stevenson has been harassed unmercilessly for years, in dozens of documented incidents, four PIPs and disciplines, but the District claims Stevenson was not harassed and endures no emotional distress. But Stephens sends a Policy 448-representation inquiry, a mediation request, two union-mediation related emails, and two Facebook posts and the District claims it has been criminally cyberstalked and caused substantial emotional distress.[10]

---

[10]   Kristofco provides no authority for his claim that a government entity can experience substantial emotional distress.

Stephens' Facebook posts discussing matters of public interest – the discriminatory and unlawful practices of this government entity - bear no semblance to communications held outside the Constitution's protections.  For example, in *Hartzell*, the Court held online posting by defendant Cummings that Hartzell was an associate of the Scarfo crime family and a participant in witness protection to be outside the protection of the Constitution because that information created an immediate threat to his personal safety with no countervailing public concern. See *Hartzell v. Cummings*, No. 150103764, 2015 Phila. Ct. Com. Pl. LEXIS 313, at *17-18.  In most cases, violations of Section 2709.1 include threats of physical violence, often with family members or former spouses. See, e.g., *Commonwealth v. Krause*, 18 Pa. D. & C.5th 449 (C.P. 2010) (affirming because there was sufficient evidence to support his convictions for stalking and terroristic threats based on his continued conduct of threatening his estranged wife, including violating a protective order).

Kristofco's irresponsible accusation that Stephens' stalked the District violates Rule 3.3 and the latest in a series of misstatements or law or fact. And Kristofco wishes to strike Stephens response to that and other wild allegations because he knows that the evidence, fact and law do not support his wild allegations.

### VII. The Timing of Kristofoco's Motion Shows its Real Offensive Motive

In labor and employment law timing is evidence of pretext. The suspect timing of Kristofco's motion shows its real motive. See *Spear* supra. The December 8, 2016 motion was based on communications that occurred 2 years, 6 months, 19 days earlier (May 21, 2014 email to Koslo Stahl), 110 days earlier (August 21, 2016 email to Meiswich), 99 days earlier (September 1, 2016 facilitated-dialogue email), 93 days earlier (September 7, 2016 to Meiswich), 93 days earlier (September 7, 2017 Facebook post) and 92 days earlier (September 8, 2016 Facebook post). If these communications were as prejudicial as Kristofco claimed, particularly if these communications constituted cyberstalking with the aim or effect of causing this government entity substantial emotional distress, then the Defendant would have filed the motion those many years or months earlier. Applying Judge Lloret analysis in *Spear v. Fenkell* to the facts of this case, the Court should move that the Defendant's Motion to Disqualify and other sanctions be denied.

Like its other recent pleadings, the District and its counsels would have this court apply sanctions based on vague allegations of "prejudice" alone. As used by the District, the term "prejudice" simply means that the District doesn't like reading what it is reading or hearing what it is hearing. But it is the very nature of

14

the adversarial process that parties and their counsels will read or hear arguments or positions they would prefer not to hear. Litigation is not day school nap time in which everyone must make nice at all times.

The District's motion to disqualify and related-gag order request are, like its motion for a protective order, designed to silence the most vocal critic of the discriminatory employment practices of this government institution, the officials that run this government entity and the lawyers defending its non-compliance with state and federal civil rights laws. Discriminators, particularly those with a long institutional history of racially discriminatory employment practices, never like being told they violate the law. And merely because the Districts and its counsels don't like hearing the truth, they would deprive Stephens of the right to state it.

Aside perhaps ruffling their feathers, the communications by Stephens that serve as the basis if the motion to disqualify and the expanded gag order - his innocuous inquiry about policy 448representation, his confidential emails to Meiswich related to CTRC and PR&R, privileged, his mediation privileged facilitated dialogue request, and his Constitutionally protected Facebook posts have no real impact on this government entity and the government officials running it. The discriminatory hiring and retention practices of Main Line public schools like the District have long been and continues to be objects of traditional media coverages, social media posts, public discussion and debate and litigation. This wealthy school District, zealously defended by counsel, can easily weather a few cross emails and social media posts. Kristofco's claims that the District has been prejudiced by those communications or recent pleadings is fig leaf to hides a dirty truth – the District's two-pronged attack to chase Stevenson from his employment and Stephens from this case.

Judge Lloret is right – timing is crucial in determination of whether to grant motions to disqualify like EFC No. 73. The suspiciously-timed motion to disqualify was a weapon aimed at "retiring from the scene the very lawyer in whom the Plaintiff has the most confidence" - "a thinly veiled ad hominem attack, all under the cover of a dutiful effort to reprove an ethically challenged lawyer." See *Gay* supra. On November 29, 2016, a third step -grievance meeting related to the PIP that Stevenson received as a result of Meiswich's spying was held. Nine days later, on December 8, the District retaliated against Stevenson's third-step grievance by moving for sanctions, including disqualification of Stevenson's counsel Stephens. Then the next day, December 9, the District denied the grievance (see Exhibit 3) and abrogated the parties' agreement to mediate after discovery.

These steps, in close temporal proximity, show a settled design on the part of the District to take out

Stevenson and Stephens in one fell swoop. The motion to disqualify, pleadings-inclusive gag order, grievance denial, and Rule 26 mediation-agreement breach were timed to coincide, as part of the two-pronged strategy of the District to chase Stevenson from employment and Stephens from this case. Thus, applying the timing analysis of Judge Lloret in *Spear* to the facts of this case requires denial of the District's motion to disqualify.

      The Plaintiff also moves that the Court deny the District's expanded gag order request and refuse to strike pleadings by Stephens responsive to the District's many allegations and accusations. Contrary to the District, the Constitution's due process clause requires that both sides to this matter have the ***right*** to be heard. Procedural due process is particularly crucial here because contempt and sanctions are under advisement.

      Respectfully Submitted,

      **/S/   Glenn Stephens   1/08/2016**
Glenn Stephens Ph.D., Esq.
DC Bar No. # 472780
Federal Employees Defense, LLC
1725 I Street NW, Suite 300
Washington, DC 20006
202-258-6521
Drghs3@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on January 7, 2016, a true, correct copy of the above was e-filed and thereby served upon:

Silvia Diaz, Esq.
Wisler Pearlstine, LLP
PA Bar No. 312435
460 Norristown Road, Suite 110 Blue Bell, PA  19422
(610) 825- 8400
sdiaz@wispearl.com
Attorney for Defendant, Great Valley School District

                                       Respectfully Submitted,

                                       **/S/   Glenn Stephens   1/8/2016**
                                       Glenn Stephens Ph.D., Esq.
                                       DC Bar No. # 472780
                                       Federal Employees Defense, LLC
                                       1725 I Street NW, Suite 300
                                       Washington, DC 20006
                                       202-258-6521
                                       Drghs3@gmail.com

Case 5:15-cv-05933-JLS Document 90 Filed 01/08/17 Page 18 of 18